[Cite as *State v. Cole*, 2016-Ohio-2936.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**Nos. 103187, 103188, 103189, and 103190**

---

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# GEORGE ALLEN COLE

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED IN PART, REVERSED AND
MODIFIED IN PART, AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-14-585523-A, CR-14-589681-A, CR-14-588878-B,
and CR-14-590944-B

**BEFORE:** Jones, A.J., E.A. Gallagher, J., and Boyle, J.

**RELEASED AND JOURNALIZED:** May 12, 2016

**ATTORNEY FOR APPELLANT**

Allison S. Breneman
1220 West 6th Street, Suite 303
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: John D. Kirkland
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., A.J.:

**{¶1}** Defendant-appellant George Cole appeals his multiple convictions and his 48-year prison sentence.   We affirm in part, reverse and modify in part, and remand.

## I.   Procedural History and Facts

**{¶2}** George Cole ("Cole") was arrested and charged in three separate cases for participating in six burglaries from July 19, 2014 through August 26, 2014 in Cleveland, Fairview Park, and Rocky River.   Cole was charged along with his girlfriend, Danielle Panagopoulos ("Danielle"), and his brother, John Cole ("John").   Cole and Danielle were charged in a fourth case that was unrelated to the burglaries.

**{¶3}** In Cuyahoga C.P. No. CR-14-590944-B, Cole was charged with four counts of burglary, four counts of theft, forgery, misuse of credit cards, and two counts of criminal damaging.   In Cuyahoga C.P. No. CR-14-589681-A, Cole was charged with burglary and theft.   In Cuyahoga C.P. No. CR-14-588878-B, Cole was charged with burglary, theft, and criminal damaging.   In Cuyahoga C.P. Case No. CR-14-585523-A, Cole was charged with drug possession and two counts of endangering children.   Cole pleaded no contest to the indictment in CR-14-585523-A and the case was continued for sentencing.   Cole's codefendants pleaded guilty to amended indictments, and Cole's remaining cases proceeded to a single trial before a jury.

**{¶4}** The state's theory was that Cole and his brother would case westside neighborhoods in broad daylight looking for houses in which the homeowners had left for work.   Cole drove Danielle's black Mercury Mariner SUV and would drop his brother

off near the intended target. John would break into the houses and steal jewelry, coins, and other valuables, sometimes also stealing a pillowcase to carry the stolen goods. Danielle did not accompany the men on the burglaries; her role was to take the valuables to various pawn shops and sell them.

{¶5} When Danielle was arrested, she had several cell phones in her car, including one that Cole used, and a book in which the group kept a log of the houses they had burglarized along with many other properties that, according to the state, the group was targeting.

a. **Cleveland Burglaries**

{¶6} The first burglary occurred on July 19 or 20, 2014, while the Readinger family was asleep in their Cleveland home. When Mrs. Readinger woke up the next morning, she discovered a window screen in her kitchen had been moved. She did not realize her purse was missing until her credit card company called her to report suspected fraud. She discovered that her credit card had been used at two gas stations and someone forged her signature on the credit card slips. Her purse also contained a Kindle reader, makeup, and credit cards. She valued the missing items at $600; none of the items were recovered.

{¶7} Officer Thomas Manson of the Cleveland Police Department investigated the burglary and discovered that the victim's credit card had been used at a Marathon gas station. The officer requested surveillance video and saw two men on the video, one who appeared to be using Readinger's credit card.

{¶8} Karen Fletcher, who worked at the gas station, retrieved the video surveillance and credit card receipt for the police. Fletcher identified Cole, whom she happened to be related to, as the man who used the stolen credit card. Danielle, who testified for the state at trial, also identified Cole in the video. Danielle confirmed that "John [Cole] stole a purse out of a lady's kitchen window, and they [John and Cole] used the credit card to buy gas and cigarettes at that gas station."

{¶9} On August 8, 2014, the Vietses' residence was burglarized. That day, Mrs. Viets left the house to take her daughter to a doctor's appointment. Her son, who was home from college, left the house to do some work at a local church. When Mrs. Viets returned home from the appointment, she discovered that the back door to the house had been kicked in and her jewelry boxes were missing from her bedroom. A pillowcase and one of her husband's rings was also missing. The victim estimated that the value of the jewelry was "probably about $3,000, $3,500."

{¶10} The Vietses' residence was located near a Sunoco gas station. Vietses' son discovered that the gas station had surveillance cameras. He went to the gas station that same day and viewed video from around the time of the break-in. The video showed a black SUV slow down in front of the Vietses' house and then drive away. Mrs. Viets pulled out in her minivan and the black SUV returned shortly thereafter. The SUV pulled into the Sunoco gas station and two men exited the vehicle. One of the men walked down the street up to the Vietses' driveway. Another camera angle showed the same man walk across Vietses' neighbor's yard carrying something white a short time

later.

{¶11} Vietses' son testified that he saw the second male get into the driver's seat of the SUV, pull out of the Sunoco station, and park on his street. The son identified the driver of the SUV in court as Cole. Cleveland Police Detective David Shapiro, who investigated the burglary and viewed the surveillance video, was also able to identify Cole as the driver of the black SUV.

{¶12} On August 21, 2014, Joseph Dallos received a phone call at work from his neighbor telling him his house had been broken into. He returned home to discover that his back door had been kicked in and his side porch door was open. His porch railing was also damaged. Drawers in the dining room and bedroom had been rifled through but neither he nor his wife discovered anything missing. He estimated the damage to his porch and door to be $700.

{¶13} The same day, Dallos's next door neighbor, Jay Kwast, returned home from work to find two big dents in the doorknob of the side door to his house. One of his downstairs windows was punched in and the outside part of the window was laying on the ground. His house had been ransacked. A pillowcase from his bed was missing and a drawer full of nickels and dimes had been emptied. Kwast received an $800 estimate to fix the window.

{¶14} Ann Stefancin testified that she was neighbors with Dallos and Kwast. On August 21, 2014, she was exercising in her sunroom when she saw a person dressed in black pants and hoodie run up the back steps of Dallos's house. Stefancin went outside

with her son and saw an unfamiliar black SUV parked in front of the same house. Stefancin yelled out her neighbors' names and saw the person running down the street carrying "a small bag."

{¶15} The next day, August 22, Danielle received $424.99 for jewelry she sold to a pawn shop, 650 Gold.

**b. Fairview Park Burglary**

{¶16} On August 13, 2014, the Fassetts left their house to go to lunch. When they returned, Mrs. Fassett found that her bedroom had been ransacked. Mr. Fassett discovered that whomever broke into the house had made entry through a sliding glass door; he found pry marks on the door's metal frame.

{¶17} Mrs. Fassett testified that she lost at least 50 items of jewelry, which consisted of five-generations worth of jewelry passed down from daughter to daughter. The jewelry included her wedding rings, her mother's wedding rings, and her grandmother's and great-grandmother's wedding bands. The stolen jewelry was valued at $75,000. She only recovered three tiny earrings; by the time police found where some of her other jewelry had been sold, it had already been sent out to be melted down.

{¶18} Fairview Park Police Officer Donald Franks reviewed video of the Fassett's house caught by cameras mounted on their neighbor's house. The video showed the victims leaving their house at 11:56 a.m. on August 13, 2014. Shortly thereafter, a black Mercury Mariner SUV passed by the house. A few minutes later, a man walked into view from the direction the SUV had gone. The man stopped at the Fassett's driveway,

looked around, and walked up the driveway. The video showed the Mariner passing back and forth every few minutes.

{¶19} Also, on August 13, 2014, John and Cole texted each other the following exchange beginning at 1:37 p.m.:

> John:   This dude[']s like OMG your [sic] killing me and he was like there's a lot of 14 karat hahaha.
>
> Cole: Lol good maybe 6,000.
>
> John:   He's gonna have to go to the bank for sure.
>
> Cole:   Tell him get to walking.
>
> John:   He's still going through this s*** and he got a lot more to do.
>
> Cole:   How long will it take him to go to bank.
>
> John:   Don't know the bank right next store [sic].
>
> John:   Their [sic] testing some and taking the stones
>
>                   out we got a lot of 14 karat.

## c.  Rocky River Burglary

{¶20} Jane Blahovec, age 82, testified that she returned home from her Zumba class on August 26, 2016, to find that her back door had been destroyed. Her house was in disarray and she was missing her and her husband's wedding rings, valuable jewelry, her husband's coin collection, Franklin Mint memorabilia, a suitcase, a pillowcase from her bed, and money. Blahovec estimated the worth of the jewelry to be around $20,000 and was able to recover some items from a pawnshop by paying her own money to buy the items back.

{¶21} Rocky River Detective Craig Witalis investigated the Blahovec burglary and found that access to the house was made through the use of a pry bar on the rear door. The detective recovered some of Blahovec's stolen items at American Eagle Pawn; Patrick Marek of American Eagle testified he paid Danielle Panagopoulos $350 for "coins and other items," on August 29, 2014. Danielle testified that she remembered selling coins on August 29, 2014. On that date, the brothers accompanied Danielle to the pawn shop and she and John went inside while Cole stayed in the car.

### d. State's Case

{¶22} Danielle testified that she had been engaged to Cole and they had two children together. She owned a black Mercury Mariner SUV that Cole often drove. In 2014, she was unemployed and addicted to heroin. Cole was also unemployed. To support her family, Cole and his brother, John, would "rob" houses. Their method was to "go out early in the morning before people went to work and case up and down the streets to see when cars would leave, then they would go inside. Well, John would go inside, George would stay out in the car." When they were done, they would return to John's house, call Danielle, and she would take the items to pawn shops.

{¶23} Danielle admitted to selling stolen goods at 650 Gold, American Eagle, San Juan Jewelry, and Uncle Ben's. Danielle admitted that the signatures on the 650 Gold receipts were hers and the only items she pawned were ones that the Cole brothers had given her.

{¶24} According to Danielle, Darrell Fletcher, Cole's father, who was deceased at

the time of trial, also helped sell the stolen jewelry. Steven Hobbs, Cole's cousin, also participated in some of the burglaries. According to Danielle, Hobbs participated in the Dallos burglary and injured himself on the porch.

{¶25} Danielle testified that she entered a plea deal with the state. She had heard that the trial court had a "tough reputation on sentencing" and agreed to plead guilty to a lower felony that would subject her to a lower prison sentence in exchange for testifying truthfully against Cole. She admitted she had recently been sentenced to probation, was a convicted felon, and was a "junkie" who had lost custody of her children. She also admitted writing letters to Cole in prison stating that she loved him and, although she had talked to the police, she had lied to them and would "fix it." At trial, Danielle maintained that she had lied in her letters to Cole.

{¶26} Roy Roberts, who managed various locations of 650 Gold, testified that the store took in several items of jewelry from Danielle over eight days in August 2014; Danielle had personally signed the sales receipts. Roberts explained the process by which his stores accepted jewelry for purchase. In order to comply with state law, the sales clerk must make a photocopy of the seller's state identification and have the seller sign a sales receipt. The computer-generated sales receipt would include the seller's signature, a description of the item purchased, its weight, and the amount paid for the item. Each receipt was in triplicate form: one copy was saved for the state of Ohio, one copy was attached to the item, and one copy was given to the seller.

{¶27} Keller's Jewelry owner, Tommy Swan, Jr., testified that a white male came

into his store with "a bunch of jewelry, in two large Ziploc freezer bags" and asked Swan if the store bought jewelry. Swan made the male an offer for the jewelry. The man asked to use the store's phone to call his "brother." Swan talked to the man's brother but they could not agree on a price so the man used Swan's phone to call another pawn shop, 650 Gold. According to Swan, he offered the man $4,500 for "a lot of jewelry in both bags. It was high-end jewelry, 18, 21 karat [gold] rings, bracelets, chains. It was very nice, very nice jewelry."

{¶28} The police came into Keller's Jewelry about two weeks later and showed Swan some pictures of burglary suspects. Swan picked one of the men as the man with the Ziploc bags of jewelry. Swan was unable to make an in-court identification of Cole.

{¶29} Detective Shapiro testified that he investigated the Viets and Readinger burglaries, viewed the video from the Sunoco gas station, and developed George and John Cole as suspects. He eventually arrested George Cole. Detective Shapiro secured a warrant for the cell phone he recovered from Danielle's car; Danielle testified the cell phone belonged to Cole and he was the only one who used that phone. There was also evidence that Cole's cell phone was used in the vicinity of the burglaries, as evidenced by data from cell phone towers.

{¶30} After hearing from 24 witnesses and viewing over 90 exhibits, the jury convicted Cole of all charges. The trial court sentenced him to a total of 48 years in prison.

{¶31} Cole filed a timely notice of appeal, raising seven assignments of error for

our review.

## II. Assignments of Error

I.    The jury found, against the manifest weight of the evidence, that the appellant committed the acts charged in the indictment.

II.    The evidence was not legally sufficient to sustain a guilty verdict.

III.    Joinder of the burglary charges created a severe prejudice to appellant.

IV.    The trial court erred by not including a jury instruction for the lesser included [offense of] burglary.

V.    The trial court erred in admitting videos as exhibits over defense's objection.

VI.    The trial court imposed an excessive sentence that subjects appellant to cruel and unusual punishment in violation of the Ohio state Constitution Article I, Section 9.

VII.    The trial court abused its discretion by imposing a prison sentence contrary to R.C. 2929.14 and the purposes and principles of the felony sentencing guidelines and erred by imposing consecutive sentences.

## III. Law and Analysis

### a.    Sufficiency and Manifest Weight of the Evidence

{¶32} In the first and second assignments of error, Cole argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶33} Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense. Crim.R. 29(A) and sufficiency of evidence review require the same analysis. *Cleveland*

*v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571, ¶ 12, citing *State v. Mitchell*, 8th Dist. Cuyahoga No. 95095, 2011-Ohio-1241.

**{¶34}** A challenge to the sufficiency of the evidence supporting a conviction requires the court to determine whether the prosecution has met its burden of production at trial. *State v. Givan*, 8th Dist. Cuyahoga No. 94609, 2011-Ohio-100, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). On review for sufficiency, courts are not to assess whether the prosecution's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Id.*, citing *id.* The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Vickers*, 8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, ¶ 17, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶35}** In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as enunciated in *Thompkins*:

> In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the

evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

*Id.* at ¶ 25.

{¶36} An appellate court may not merely substitute its view for that of the factfinder, but must find that "'in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Walker*, 8th Dist. Cuyahoga No. 99239, 2013-Ohio-3522, ¶ 36, quoting *Thompkins* at 387. "Accordingly, reversal on manifest weight grounds is reserved for 'the exceptional case that the evidence weighs heavily against the conviction.'" *Id.*, quoting *id.*

## 1. "Likely to be Present" Element of Burglary

{¶37} In CR-14-590944-B, Cole was convicted of one count of burglary as to Joseph Dallos and one count of burglary as to Jay Kwast, in violation of R.C. 2911.12(A)(2), which provides the following:

No person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person * * * is present or likely to be present, with purpose to commit in the habitation any criminal offense.

{¶38} Danielle testified to Cole's participation in the burglaries at the Dallos and

Kwast homes. Circumstantial evidence also linked Cole to the burglaries at these houses, including the neighbor who saw an unfamiliar black SUV parked in front of Dallos's house. But we find that the state failed to present sufficient evidence of the "present or likely to be present" element of R.C. 2911.12(A)(2).

{¶39} Both Dallos and Kwast testified that they were at work when the burglaries occurred; Dallos's wife was also at work and Kwast lived alone. The Ohio Supreme Court has recognized that the state can establish the "likely to be present" element of burglary under R.C. 2911.12(A)(2) by showing that the occupants of the dwelling were "in and out on the day in question" and were temporarily absent when the burglary occurred. *State v. Kilby*, 50 Ohio St.2d 21, 361 N.E.2d 1336 (1977), paragraph one of the syllabus. Conversely, Ohio courts have also found that "where the occupants of a house are absent as part of their regular workday, they are not likely to be present during the day." *State v. McCoy*, 10th Dist. Franklin No. 07AP-769, 2008-Ohio-3293, ¶ 23, citing *State v. Frock*, 2d Dist. Clark No. 2004CA76, 2006-Ohio-1254. The state must adduce specific evidence that the occupants of the dwelling were present or likely to be present at the time the burglary occurred.

{¶40} This court has discussed the "likely to be present" element of the crime of second-degree burglary as follows:

> A person is likely to be present when a consideration of all the circumstances would seem to justify a logical expectation that a person could be present. * * * In determining whether persons were present or likely to be present under R.C. 2911.12(A)(2), "the defendant's knowledge concerning habitation is not material. The issue is not whether the burglar subjectively believed that persons were likely to be there, but whether it was

objectively likely." * * * Merely showing that people dwelled in the residence is insufficient; the state must adduce specific evidence that the people were present or likely to be present at the time of the burglary. * * *

*State v. Palmer*, 8th Dist. Cuyahoga No. 89957, 2008-Ohio-2937, ¶ 13.

{¶41} In *State v. Richardson*, 8th Dist. Cuyahoga No. 100115, 2014-Ohio-2055, ¶ 23, this court found insufficient evidence of second-degree burglary when the state failed to elicit testimony to establish the "likely to be present" element of the crime. This court noted that, on the day of the burglary, the victim left for work at 7:00 a.m., returned home at 3:00 p.m., and routinely worked from 8:00 a.m. until 2:00 or 3:00 p.m. Because the burglary occurred shortly before noon on a workday, this court determined that the victim was not "likely to be present." *Id.*

{¶42} Dallos testified that he left for work at 6:30 a.m. and his wife left shortly thereafter. Around 11:00 a.m. he received a phone call that his house had been broken into and both he and his wife returned home. The state did not elicit any testimony that the Dalloses routinely returned home during the workday or that anyone else lived at their home; therefore, the state failed to show that Dallos were likely to be present at the time the burglary occurred.

{¶43} Kwast testified that he lived alone. "Where a person individually occupies an apartment and his [or her] usual and ordinary work habits take him [or her] away from that apartment regularly, during certain hours of the day, at a time there is minimum likelihood that a person will be present therein."' *State v. Meisenhelder*, 8th Dist. Cuyahoga No. 76764, 2000 Ohio App. LEXIS 4745, *14 (Oct. 12, 2000), quoting *State v.*

*Lockhart*, 115 Ohio App.3d 370, 373, 685 N.E.2d 564 (8th Dist.). Kwast testified he left for work at 7:30 or 8:00 in the morning and did not return until 6:00 p.m. on the day of the burglary. The state failed to elicit any evidence that Kwast was likely to be present at the time the burglary occurred.

{¶44} Again, the state had the burden showing that victims were likely to be present at their homes at the time of the break-ins. *Meisenhelder* at *14-15. The state did not meet its burden in this case as to the burglary counts that related to the Dalloses and Kwast.

{¶45} That being said, although the state failed to present sufficient evidence to sustain a conviction of burglary under R.C. 2911.12(A)(2), Cole may be convicted of the lesser included offense of burglary under R.C. 2911.12(A)(3). Burglary under R.C. 2911.12(A)(3) is a lesser included offense of burglary under R.C. 2911.12(A)(2) because it contains all the elements of R.C. 2911.12(A)(2) *except* the presence or likely presence of another. *State v. Butler*, 8th Dist. Cuyahoga No. 97649, 2012-Ohio-4152, ¶ 18.

{¶46} In this case, the state produced sufficient evidence on all of the elements except for "present or likely to be present"; thus, we find that the evidence supports a finding of guilt under R.C. 2911.12(A)(3), a third-degree felony. Pursuant to App.R. 12(A)(1)(a), this court has the authority to modify the trial court's judgment. Therefore, we remand with instructions for the court to modify the judgment of conviction to find Cole guilty of burglary under R.C. 2911.12(A)(3) and to resentence him on Counts 26 and 29 in Case No. CR-590944-B. *See Richardson* at ¶ 26, 35, citing *Butler* at ¶ 18.

## 2. Remaining Convictions

{¶47} Cole further claims that no physical evidence linked him to the crimes. But "[p]roof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988).

{¶48} In this case, the state presented extensive evidence, which established Cole's participation in the burglaries. The state's evidence showed that Cole and his brother broke into the Readinger house and stole the victim's purse and subsequently used her credit card at two gas stations. A relative of Cole's worked at one of the gas stations and identified Cole as the user of the stolen credit card. Danielle, Cole's girlfriend, confirmed that Cole participated in the burglary and used the stolen credit card.

{¶49} Detective Shapiro recognized Cole in surveillance video footage as the driver of the black SUV in the Vietses burglary. The Vietses son also identified Cole as the driver. There was also sufficient evidence linking Cole to the Fassett burglary. Surveillance video showed a black SUV casing the house before and during the burglary. Danielle admitted she and John pawned the jewelry that was taken from the house. And the state submitted evidence of Cole exchanging text messages with John about the stolen goods shortly after the burglary.

{¶50} The final burglary, which occurred in Rocky River, followed the same pattern as the previous five, with evidence that Danielle pawned the stolen items with

John while Cole waited in the car. This evidence, viewed in a light most favorable to the state, constituted sufficient evidence to support Cole's convictions.

{¶51} We also conclude that this is not the exceptional case where the evidence weighs heavily against the convictions. Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. The trier of fact is best able "'to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999,

¶ 26, quoting *Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264,

¶ 24.

{¶52} Cole attacks Danielle's credibility, claiming that her agreement to testify against him as part of her plea deal with the state motivated her to lie. But the jury was fully aware of the plea agreement and defense counsel was afforded the opportunity to cross-examine, and extensively cross-examined, Danielle on the specifics of her plea deal. Thus, the jury was well aware of the circumstances surrounding Danielle's plea and apparently still chose to believe Danielle; such is the province of the jury.

{¶53} Thus, we cannot say that Cole's convictions were not supported by sufficient evidence or that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

Accordingly, we overrule the first assignment of error, except as to the two counts of burglary as modified. As to those two counts, the first assignment of error is moot. We sustain the second assignment of error in part. **b. Joinder of Burglary Charges**

{¶54} In the third assignment of error, Cole argues that the trial court erred to his prejudice by combining his cases into a single trial. This court reviews a trial court's decision on joinder for an abuse of discretion. *State v. Grimes*, 8th Dist. Cuyahoga No. 94827, 2011-Ohio-4406, ¶ 15, citing *State v. Segines*, 8th Dist. Cuyahoga No. 89915, 2008-Ohio-2041.

{¶55} Under Crim.R. 8(A), which governs the joinder of offenses, two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Similarly, Crim.R. 13 provides that a trial court may order two or more indictments or informations, or both, to be tried together, "if the offenses or the defendants could have been joined in a single indictment or information."

{¶56} The law favors joining multiple offenses in a single trial if the requirements of Crim.R. 8(A) are satisfied. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990); *State v. Ferrell*, 8th Dist. Cuyahoga No. 100659, 2014-Ohio-4377, ¶ 38. If it appears, however, that the defendant would be prejudiced by the joinder, a trial court may grant a severance. Crim.R. 14; *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 95. The defendant bears the burden of proving prejudice. *State v.*

*Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29.

**{¶57}** If a defendant claims that he or she will be prejudiced by the joinder of multiple offenses, the state may rebut that claim by showing that the evidence of each crime is simple and distinct ("joinder test") or evidence of other crimes would be admissible even if the counts were severed ("other acts test"). *Lott* at *id.* "A trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder*, 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33, citing *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981). Joinder is therefore not prejudicial when the evidence is direct and uncomplicated and can reasonably be separated as to each offense. *Id*., citing *id.*

**{¶58}** If the state can meet the requirements of the "joinder test," it need not meet the requirements of the stricter "other acts test." *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 66, citing *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991). A defendant is therefore not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B). *Id*., citing *id.*

**{¶59}** Evid.R. 404(B) allows the admission of "other acts" evidence so long as it is "related to and shares common features with the crime in question." *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), paragraph one of the syllabus. Specifically, evidence of other crimes, wrongs, or acts is admissible under Evid.R. 404(B) if the evidence shows "proof of motive, opportunity, intent, preparation, plan, knowledge,

identity, or absence of mistake or accident." But evidence of other crimes, wrong, or acts is inadmissible merely to show that an accused has the propensity to commit the crime or acted in conformity with a particular character trait. Evid.R. 404(B).

{¶60} In this case, joinder was proper because each of the offenses was of similar nature and based on the same course of conduct. The evidence in each of the cases was simple and direct, and there is no indication in the record that the jury confused the evidence as to the different counts or that it was influenced by the cumulative effect of the joinder. The burglaries were committed within a one-month time span and in close proximity on the westside of Cuyahoga County. Because they happened in more than one city, they were investigated by various police departments, but the departments collaborated in their investigations. Each victim testified to a separate and distinct crime that Cole and his codefendants committed and Danielle was instrumental in testifying against Cole regarding all of the crimes.

{¶61} Moreover, much of the evidence introduced at trial — the cell phone records, photographs, and witness testimony — would have been admissible in each trial to show proof of Cole's motive, opportunity, preparation, plan, and knowledge under Evid.R. 404(B). Cole claims that the Sunoco videotape however would have only been allowed into evidence in the Vietses burglary, and therefore, its admission prejudiced him as to the other cases. But it has never been a requirement, nor would it be logical, that all of the evidence presented at a joint trial be admissible as to each of the offenses.

{¶62} This case is akin to *Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899,

2015-Ohio-1013, where this court found that the requirements of Crim.R. 8(A) were met in a situation where the defendant committed offenses that were related in character and manner and constituted a particular course of conduct. The defendant and his accomplices systematically "scope[d]" out places to rob to confirm whether a particular location was "sweet" for a robbery. *Id.* at ¶ 68. The group also understood their roles in the crimes — the person who would cause a distraction, the gunman who took the money, and the getaway driver. *Id.* This court concluded that the joinder of the offenses demonstrated the defendant's role in the crime spree. *Id.*

{¶63} Here, the evidence showed that Cole and his brother would scope out houses during the day when people might be at work or otherwise out of the house. In most instances, Cole drove and John broke into the houses. Danielle, sometimes accompanied by one or both brothers, would pawn the stolen goods. As in *Peterson*, the joinder of the offenses demonstrated Cole's role in the crime spree.

{¶64} In light of the above, the trial court did not err in joining the offenses. The third assignment of error is overruled.

c. **Jury Instructions**

{¶65} In the fourth assignment of error, Cole argues that the trial court erred when it refused to instruct the jury on the lesser included offense of burglary. Cole, who was convicted of second-degree felony burglary under R.C. 2911.12(A)(2), claims that the trial court should have instructed the jury that they could consider whether he was instead guilty of third-degree felony burglary under R.C. 2911.12(A)(3). Because we have

already found that there was insufficient evidence to support Cole's convictions for burglary under R.C. 2911.12(A)(2) as to the victims, the Dalloses and Kwast, we will not consider those convictions under this assignment of error.

{¶66} "An instruction on a lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense." *State v. Carter*, 89 Ohio St.3d 593, 600, 734 N.E.2d 345 (2000). Moreover, the lesser included offense instruction is not warranted every time some evidence is presented to support the inferior offense. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). Rather, a court must find "sufficient evidence" to "allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense." (Emphasis sic.). *Id.* at 632-633. In making the determination of whether the instruction was required, the reviewing court must view the evidence in a light most favorable to the defendant. *State v. Smith*, 89 Ohio St.3d 323, 331, 731 N.E.2d 645 (2000).

{¶67} During trial, Cole requested the court instruct on third-degree felony burglary, which would omit the element of "present, or likely to be present" in R.C. 2911.12. But having reviewed the record and given the totality of the evidence, we cannot say that the jury could have reasonably acquitted Cole of second-degree felony burglary under R.C. 2911.12(A)(2) and found him guilty of the lesser included offense of third-degree felony burglary under R.C. 2911.12(A)(3) as to the burglaries at the Viets,

Fassett, and Blahovec homes.[1]   Viets left her house for a doctor's appointment, the Fassetts went out to lunch, and Blahovec went to an exercise class.   Any of these victims could have returned to their homes at any time.   Again, where the state proves that an occupied structure is a permanent dwelling house that is regularly inhabited, the occupying family was in and out on the day in question, and the house was burglarized when the family was temporarily absent, then the state has presented sufficient evidence to support that element of present or likely to be present.   *See Lockhart*, 115 Ohio App.3d at 373, 685 N.E.2d 564 (8th Dist.1996), citing *Kilby*, 50 Ohio St.2d 21, 361 N.E.2d 1336 (1977), at paragraph one of the syllabus.

{¶68} In light of the above, the trial court did not err in denying Cole's jury instruction request.   The fourth assignment of error is overruled.

### d .   Video Exhibits

{¶69} In the fifth assigned error, Cole claims that the trial court erred in allowing the admission of the surveillance videos taken from the Sunoco gas station and the Aleksin house (Fassett's neighbor).   We disagree.

{¶70} The admission of videotape evidence is a matter of discretion for the trial court.   *Reinoehl v. Trinity Universal Ins. Co.*, 130 Ohio App.3d 186, 195, 719 N.E.2d 1000 (10th Dist.1998).   Pursuant to Evid.R. 901(A), authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent

---

[1]Cole was charged with burglary under R.C. 2911.12(A)(1) as to the Readingers because they were home at the time of the burglary.

claims." Any person with knowledge may authenticate a photograph or videotape by testifying that it fairly and accurately depicts the subject at the time the photographs or videotape were taken. *State v. Wynn*, 5th Dist. Stark No. 2011CA00244, 2012-Ohio-3430, ¶ 39, citing *State v. Hannah*, 54 Ohio St.2d 84, 88, 374 N.E.2d 1359 (1978).

{¶71} In this case, Mr. Viets and his son testified that they went to the Sunoco gas station and viewed the surveillance camera footage on the same day their home was burglarized. The son testified that he downloaded segments of the footage to a flash drive and handed the flash drive over to police. On a later date, the son reviewed the footage with the police and confirmed that it was what he originally downloaded. In court, the son testified that the video shown during his testimony was a copy of what he had personally downloaded and identified various images that depicted his mother's vehicle, their home, and events like his mother leaving the house on the day of the burglary. Mr. Viets authenticated still photographs made from the video.

{¶72} Officer Donald Franks of the Fairview Police Department testified that he went to the Aleksin's house a couple of days after the burglary, viewed footage on Aleksin's computer, and asked Aleksin to make him a copy of the video. Officer Franks testified that Aleksin dropped the video off "the next day. He actually came in while I was at the station, and I took it from him. [I viewed it] to make sure that it was what he had shown me the night before and had everything that we requested."

{¶73} In light of the above, we find that both videos were properly authenticated

under Evid.R. 901. Mr. Viets and his son viewed the original footage at the Sunoco gas station the same day their home was burglarized and the son testified that the images on his edited version matched the original on the store's hard drive. Officer Franks viewed the original footage related to the burglary at the Fassett house, compared it to the edited footage, and determined it to be a fair and accurate representation of the original footage and scene itself. *See Wynn* at ¶ 41. Therefore, the trial court did not abuse its discretion in admitting the videotapes into evidence. The fifth assignment of error is overruled.

**e. Sentencing**

{¶74} In the sixth and seventh assignments of error, Cole challenges his sentence. In the sixth assignment of error, Cole claims that his total sentence of 48 years was "greatly disproportionate and amounts to the imposition of cruel and unusual punishment for his crimes." In the seventh assignment of error, Cole argues that the trial court failed to make the requisite statutory findings to impose consecutive sentences and his sentence of 48 years in prison was inconsistent with felony guidelines and an abuse of the trial court's discretion. Because we modified his conviction as to two counts of burglary and remanded those counts for resentencing, the following analysis does not pertain to those counts.

{¶75} Contrary to Cole's claim, in reviewing felony sentences, we no longer use an abuse of discretion standard of review, but apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Tate*, 8th Dist. Cuyahoga No. 97804, 2014-Ohio-5269, ¶ 55.

**{¶76}** R.C. 2953.08(G)(2) provides:

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division(B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

**{¶77}** Thus, R.C. 2953.08(G)(2) requires an appellate court to review the entire record to determine if it clearly and convincingly finds that the record does not support the sentencing court's statutory findings or if the sentence is otherwise contrary to law. *State v. Weaver*, 8th Dist. Cuyahoga No. 102902, 2016-Ohio-811, ¶12.

**{¶78}** Cole concedes that his sentences are not contrary to law, but argues that they were excessive. The decision, however, "'as [to] how long a sentence should be — assuming it falls within a defined statutory range — is a pure exercise of discretion.'" *State v. Gonzalez*, 8th Dist. Cuyahoga No. 102579, 2015-Ohio-4765, ¶ 7, quoting *State v. Akins*, 8th Dist. Cuyahoga No. 99478, 2013-Ohio-5023, ¶ 16. The Ohio Supreme Court has made it clear that trial courts have full discretion to impose a prison sentence within the statutory range. *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus. Thus, apart from any claim that the sentencing judge

failed to fulfill a statutorily mandated obligation before imposing sentence, a sentence falling within the statutory range is unreviewable. *Akins* at *id.*

## 1. Purposes and Principles of Sentencing

{¶79} A sentencing court is required to consider the purposes and principles of sentencing pursuant to R.C. 2929.11 and 2929.12. Under R.C. 2929.11(A), a felony sentence shall be reasonably calculated to achieve two "overriding purposes": (1) to protect the public from future crimes by the offender, and (2) to punish the offender using the minimum sanctions the court determines will achieve those purposes. Further, under R.C. 2929.11(B), the sentence imposed for a felony must be commensurate with the seriousness of the offender's conduct and consistent with sentences imposed for similar crimes committed by similar offenders.

{¶80} Under R.C. 2929.12(A), a court sentencing a felony offender has discretion to determine the most effective way to comply with the purposes and principles of sentencing outlined in the statute. In exercising its discretion, however, the sentencing court must consider the seriousness, recidivism, and other mitigating factors set forth in R.C. 2929.12. *Id.*

{¶81} Recently, the Ohio Supreme Court reaffirmed that we review felony sentences pursuant to R.C. 2953.08(G). *State v. Marcum*, Slip Opinion No. 2016-Ohio-1002, ¶ 23. As to the consideration of the factors in R.C. 2929.11 and 2929.12, the court noted a reviewing court's duty to defer to the sentencing court and reiterated that "an appellate court may vacate or modify any sentence that is not clearly

and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *Id.*

{¶82} Thus, although the trial court must consider the principles and purposes of sentencing as well as the mitigating factors, the court is not required to use particular language or make specific findings on the record regarding its consideration of those factors. *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31; *State v. Jones*, 8th Dist. Cuyahoga No. 99759, 2014-Ohio-29, ¶ 13. In fact, consideration of the appropriate factors can be presumed unless the defendant affirmatively shows otherwise, *State v. Weaver*, 8th Dist. Cuyahoga No. 102909, 2016-Ohio-811, ¶ 17, citing *Jones*, and a trial court's statement in its sentencing entry that it considered the required statutory factors is sufficient to fulfill this obligation. *State v. Sutton*, 8th Dist. Cuyahoga Nos. 102300 and 102302, 2015-Ohio-4074, ¶ 72, citing *State v. Clayton*, 8th Dist. Cuyahoga No. 99700, 2014-Ohio-112, ¶ 9. Here, the trial court stated in its sentencing journal entries that it had considered "all required factors of law [and] finds that prison is consistent with the purpose of R.C. 2929.11."

{¶83} Cole claims that the court failed to sentence him consistent with other offenders, specifically his brother, John Cole, and claims that his sentence was harsher because he chose to go to trial rather than taking a plea. While we are aware that a sentence may not be influenced by a defendant's exercise of his or her constitutional right to a jury trial or the entering of a plea, the burden of proving that a sentence was vindictive falls on the defendant. *United States v. Goodwin*, 457 U.S. 368, 372, 102

S.Ct. 2485, 73 L.Ed.2d 74 (1982); *State v. O'Dell*, 45 Ohio St.3d 140, 543 N.E.2d 1220 (1989), paragraph two of the syllabus; *United States v. Poole*, 407 F.3d 767, 774 (6th Cir. 2005), *certiorari denied*, 546 U.S. 913, 126 S.Ct. 279, 163 L.Ed.2d 248 (2005). There is no evidence in the record that the court acted vindictively, and Cole has failed to provide this court with any.

**{¶84}** Cole also claims that his sentence should have been in line with the 21 years in prison John received, because, as John was the one who actually committed the burglaries, John was more culpable. Accomplice liability aside, comparing the brothers' sentences is an apples-to-oranges comparison. First, Cole was convicted in four cases of a total of 16 counts of burglary, theft, forgery, criminal damaging, drug possession, misuse of a credit card, and child endangering.[2] John, on the other hand, was indicted in three cases and pleaded guilty to five counts of burglary and one misdemeanor count of theft.

**{¶85}** We further note that when considering R.C. 2929.11(B) and the term of imprisonment for each conviction, John was sentenced to seven years on each burglary and Cole was sentenced to eight years on each burglary. The difference in the sentences for the individual burglaries was, therefore, only one year. We are cognizant that Cole's biggest complaint is the overall length of his sentence, but that goes to the consecutive nature of his convictions, not the term he was sentenced to on each conviction.

---

[2]Because Cole will be resentenced on two of the burglary counts, his sentence is currently 32 years in prison with the possibility of a maximum of another 36 months in prison on each burglary conviction.

{¶86} During the sentencing hearing, the trial court considered Cole's extensive criminal history, his presentence investigation report, the arguments of counsel, Cole's statement, and what occurred during trial, including Cole's troubling behavior, which included making gestures and mouthing words to female jurors and the trial judge herself. The court also considered evidence seized from Danielle's car that showed other burglary targets. There is no doubt that by the time Cole was sentenced, the trial court had gained a greater appreciation of the details of the charged crimes and insight into Cole's character, having presided over a lengthy trial that included 24 witnesess and 91 exhibits. *See State v. Elkins*, 6th Dist. Sandusky No. S-08-014, 2009-Ohio-2602, ¶ 19 (nothing in the record to support a finding that the appellant's sentence was vindictive; the trial court had gained a greater appreciation of the details of the crimes and the appellant's character by the time of the sentencing hearing).

{¶87} In light of the foregoing, it is evident from the record that the trial court considered the purposes and principles of sentencing, the seriousness and recidivism factors, and relevant sentencing factors prior to the imposition of sentence.

## 2. Imposition of Consecutive Sentences

{¶88} Cole also challenges the consecutive nature of his sentences, arguing that the record does not support his sentence. But, again, R.C. 2953.08(G)(2) makes it clear that if the court has properly made the required findings in order to impose consecutive sentences, we must affirm those sentences unless we "clearly and convincingly" find "[t]hat the record does not support the court's findings[.]" In *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453 (8th Dist.), this court noted:

It is also important to understand that the clear and convincing standard

used by R.C. 2953.08(G)(2) is written in the negative. It does not say that

the trial judge must have clear and convincing evidence to support its findings. Instead, it is the court of appeals that must clearly and convincingly find that the record does not support the court's findings. In other words, the restriction is on the appellate court, not the trial judge. This is an extremely deferential standard of review.

*Id.* at ¶ 20.

{¶89} Cole challenges a single R.C. 2929.14(C)(4) finding that the court made before ordering consecutive service: that consecutive sentences were not disproportionate to the seriousness of his conduct. In considering whether his consecutive sentences were disproportionate we consider whether they were disproportionate to *Cole's own* conduct, not whether running the sentences consecutive was disproportionate to John Cole's sentence.

{¶90} After considering the presentence investigation report, listening "carefully to the trial of this case," the arguments of counsel, and Cole's statement, the trial court made the following findings in ordering the felony counts to be served consecutively:

> The Court does find that consecutive sentences are necessary to protect the public from future crime. The court finds that consecutive sentences are necessary to punish the offender. The court further finds that consecutive sentences are not disproportionate to the seriousness of the offender's conduct. The court further finds that consecutive sentences are not disproportionate to the danger this defendant poses to the public.
>
> And the Court finds that offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

And that when the court makes this finding, the court does consider that he has eight convictions for either assault or felonious assault.

* * * And he has numerous other convictions for drugs and various offenses.

But certainly his conduct in this case, where he actually rode around with his brother, and they actually pilfered communities and streets, and many of the individuals were elderly and apparently -- if you go by the chart that they made, of the various places that they struck -- and I admit * * * there were no convictions for any of those indicated burglaries. Their records indicate that they nonetheless had frequented or visited those homes, and had information with reference to what could constitute burglary offenses.

Now, I give to you that those cases were not presented, nor were they relevant during the process of this trial. But it is an indication of a danger an individual may pose to the community. And that was based upon the records that were apprehended from his own vehicle.

So therefore, the Court believes that consecutive sentences are necessary.

**{¶91}** The trial court also stated that it considered that John showed remorse while Cole showed none. When defense counsel insisted Cole could not show remorse because he maintained his innocence, the court indicated that Cole had not behaved in a respectful manner during trial, scaring female jurors by "winking, blinking, and mouthing things" to them and committing the same acts towards the court itself. The court stated that "[t]o conduct himself with respect throughout the course of the proceeding would have indicated he had some respect, some remorse." The court further stated that many of the burglary victims were elderly, were traumatized by the burglaries, and lost precious family heirlooms.

**{¶92}** In light of the above, the trial court made the requisite statutory findings in

imposing consecutive sentences and did not err in finding that Cole's consecutive sentences were not disproportionate to his conduct. Under *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 20-22, however, the trial court must also incorporate its consecutive sentence findings into its sentencing entry. *Id.* at syllabus. Our review of the record shows that the trial court's sentencing entries do not include the consecutive sentence findings. The trial court's omission is a clerical mistake and may be corrected through nunc pro tunc entries. *Id.* at ¶ 30.

{¶93} Therefore, the sixth and seventh assignments of error are overruled.

## f. Instructions on Remand

{¶94} The case is remanded with instructions to the court to modify the judgment of conviction in CR-14-590944-B to find Cole guilty of burglary in Counts 26 and 29 under R.C. 2911.12(A)(3), felonies of the third degree, and to resentence him on those counts. His convictions and sentences are otherwise affirmed but the court is ordered to incorporate, nunc pro tunc, the consecutive sentence findings made at sentencing into the court's entries. *Bonnell* at *id.*

{¶95} Judgment affirmed in part, reversed and modified in part, and case remanded for proceedings consistent with this opinion.

It is ordered that appellant and appellee split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of

the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

EILEEN A. GALLAGHER, J., and
MARY J. BOYLE, J., CONCUR